KITCHEN, MONTROSS & WILCOX *v.* JOHN G. A. SPEAR AND JOHN HUTCHINSON.

*Stoppage in transitu.*

A, residing in Vermont, purchased goods of B, in New York, to be forwarded by railroad to R. where A resided. Immediately on their arrival at R., and before they were placed in the warehouse of the railroad company, A having in the meantime become insolvent, C, a creditor of A, caused the goods to be attached, and to be taken directly from the cars and removed away from the railroad. The officer paid the freight upon the goods and retained possession of them under the attachment, until B demanded them of him. *Held*, that B's right of *stoppage in transitu* had not ceased at the time of the attachment, or of the demand, and that he was entitled to the goods.

36

TROVER for a quantity of goods. Plea, the general issue, and trial by jury, at the January Term, 1857,—UNDERWOOD, J., presiding. The plaintiffs gave evidence tending to show that one James Wells, a merchant at West Randolph, in Orange County, purchased the goods in question, of the plaintiffs, in the city of New York, on the 9th of January, 1851, on credit, and shortly afterwards, and before the arrival of the goods at West Randolph, became wholly insolvent; that the goods came by the freight train to West Randolph on the night of the 22d of January, 1851, between 10 o'clock and 1 o'clock at night; that the defendant, Spear, to whom Wells was indebted, procured a writ to be made against Wells in his favor, and the defendant, Hutchinson to be authorized to serve it; that Spear, (who had been informed by Wells, who then had returned, that the goods in question were on the way) and Hutchinson went down the railroad on the 22d as far as Windsor, and there found the goods and attached them on the writ; that they came up with the train, Hutchinson having been locked in the car containing the goods by Spear; that the car was switched off at West Randolph station and the goods taken out of it by Hutchinson and removed to the basement of the tavern at West Randolph; that Spear had procured men and teams to be ready at the depot to take the goods to the tavern on their arrival, and that they did so take them; that Hutchinson paid the freight to the railroad company when he took the goods from the cars; that on the 3d of February, 1851, said Hutchinson advertised said goods to be sold on the writ on the 18th of February, 1851; that he adjourned the sale from the 18th to the 25th of February, and then sold the goods at auction on the writ; that the defendant Spear bid them off and afterwards sold them; that one Chadwick, as agent of the plaintiffs', on the 17th of February, 1851, directed one Lyman to go and demand the goods of Spear, and Hutchinson; that Lyman accordingly on the 18th of February 1851, made demand of the goods for the plaintiffs, both of Spear and Hutchinson, and that they refused to give them up.

The defendants' evidence tended to show that Wells told the defendant Spear, at West Randolph, after his return, that the goods in controversy were coming on the cars, and told Spear that he must not attach them on the cars, but that he, Spear, might go

down the road and get them, and he would sell them to him (Spear;) that Wells did send Spear and Hutchinson down the road to get the goods for that purpose, and that after they arrived and were carried to the tavern, Wells sold them to Spear and gave him a bill of sale; that men and teams were procured by Wells to bring the goods from the cars to the tavern; that after Spear got the bill of sale, he removed the goods from the basement into a bed-room above, where they remained till sold by Hutchinson at auction as aforesaid, except a few sold by Spear at private sale. The defendants further gave evidence tending to show that Spear never in fact attached said goods, either on the cars or on the delivery at West Randolph; that all he had said writ for was to be used as a pretence to prevent other creditors of Wells from attaching them; that Spear knew an officer was watching the cars and ready to take any of Wells' goods that came along, and whatever proclamations he or Hutchinson made, that they had attached the goods, were intended only to keep other creditors off; that Spear never relied on any attachment, but wholly on the sale as aforesaid, and that Spear furnished Hutchinson the money to pay the freight with, and charged it over to Wells on book.

The plaintiffs further gave evidence tending to show that before Spear went down the railroad after the goods, he was advised by counsel he could not attach and hold the goods until they came to Wells' possession, as the plaintiffs had a right to stop them *in transitu* before they should come to the possession of Wells, and also that the railroad company had a lien on them for the freight.

The court charged the jury that if they found that Wells, after purchasing the goods in New York on credit, became insolvent, the plaintiffs had the right, before the goods came into Wells' possession, actual or constructive, to reclaim them and stop them *in transitu.* And if they found that the plaintiffs, by their agent, Lyman or Chadwick, made demand of them of Spear and Hutchinson, before they thus came into possession of Wells, then the plaintiffs were entitled to a verdict. And in order to determine whether the goods had arrived thus into Wells' possession on the 18th of February, the time the demand was made, it would be necessary for them to determine in what character Spear and Hutchinson acted from the time they found the goods at Windsor, up to the day of demand. If the

jury found that Spear, by Hutchinson, an authorized officer, really attached the goods at or on the way from Windsor, or on the delivery of them from the cars at West Randolph, and payment of freight, and continued to hold them as such attaching creditor and officer, up to the time of the demand, and relied upon that attachment to hold the goods, then they had not come to the possession of Wells, and the plaintiffs had a right to make the demand and stop them. But if, on the contrary, the jury found that Spear and Hutchinson were sent down by Wells as his servants and agents after the goods, and, as such servants and agents, took them from the cars for Wells, for the purpose of enabling Wells to get possession and control, that Wells might sell and transfer them to Spear, and Wells did thus sell them to Spear at the tavern, as the evidence tended to show, and that Spear's writ was only used as a means of preventing other officers from attaching them, and was only used as a pretence, or that if Spear actually attached them, but abandoned the attachment after the goods had arrived at the tavern, and surrendered the possession and control to Wells, and then made the purchase, then the goods did come to the possession of Wells, and the plaintiffs' right of stoppage *in transitu* was gone, and they could not recover. The jury returned a verdict for the plaintiffs, and the defendants excepted to the charge of the court. Before the jury retired, the court requested the defendants' counsel to state in what particulars they excepted to the charge, but they did not point out any particulars, but excepted to the whole charge.

*Peck & Colby*, for the defendants.

1. The right of stoppage *in transitu* ceases when the goods have arrived at their place of destination, and have come into the actual or *constructive* possession of the vendee. In this all the cases agree.

The duties of *railroads* as common carriers cease the moment the goods are taken from the cars and placed upon the platform. After that the goods are in the hands of the railroad as a warehouseman or bailee of the vendee. 1 Smith's Leading Cases 744, and cases there cited; *Sawyer* v. *Joslin*, 20 Vt. 172; *Norway Plains Co.* v. *Boston and Maine R. R. Co.*, 1 Gray 263; *Thomas* v. *Boston and Providence R. R. Co.*, 10 Met. 472; *Garside* v. *Trent and Mercy Navigation*, 4 Term 581.

" A case of constructive possession is where the carrier expressly or *by implication*, enters into a new agreement, distinct from the original contract of carriage, to hold the goods for the consignee as his agent, not for the purpose of expediting them to the place of their original destination pursuant to that contract, but in a new character, for the *purpose of custody on his account and subject to some new order to be given to him.* Parke, B. in *Whitehead* v. *Anderson*, 9 M. & W. 533; *Wentworth* v. *Outwaithe*, 10 M. & W. 435 ; Smith's Leading Cases, vol. 1, 763 ; *Dodson* v. *Wentworth*, 4 M. & G. 1080 ; *Foster* v. *Frampton*, 13 E. C. L. 111 ; Kent's Com. vol. 2, 545.

" The transit is at an end when the goods have so far got to the end of their journey, that they wait for new orders from the purchaser to put them again in motion to communicate to them another substantive destination, and when without such orders they would remain stationary. Lord ELLENBOROUGH in *Dixon* v *Baldwin*, 5 East 175 ; *Noble* v. *Adams*, 7 Taunton 59 ; *Bolen* v. *Huffnigle*, 1 Rawle 9.

*Crawshay* v. *Eades*, 8 E. C. L. 51 is no authority against us. In that case the goods never passed out of the hands of the common carrier as such. There was no middle man as in this case. The goods were not unloaded from the barges on which they were originally placed by the vendor.

The fact that freight was not paid can make no difference. The railroad was no less the bailee of the vendee on this account. 10 Met. 472, cited above.

2. Evidence was given tending to show that the defendants went to Windsor to find the goods and get them to West Randolph, their place of destination, with the knowledge and assent of Wells. If so, when the goods reached West Randolph depot and were taken by the defendants, with the assent of the railroad, the *transit* was ended, and their possession was Wells' possession, and they were subject to be attached as Wells' property, and the jury should have been so instructed. 1 Smith's Leading Cases 744, cited above.

*P. T. Washburn* and *P. Perrin*, for the plaintiffs.

The right of stoppage *in transitu* does not cease until the goods arrive at their place of destination, and have come into the *actual*

or *constructive* possession of the consignee. They are not in his actual possession unless they have come to his exclusive custody, and they are not in his constructive possession unless they are so situated, that no other person has charge and custody of them. When, in the course of their transit by railway, they have arrived at the station to which they are directed, they remain in the legal charge and custody of the carrier until the freight is paid. And when, as in this case, the goods, immediately upon their arrival at the station, are unloaded from the cars and delivered to the attaching officer, he paying the freight at the time, they do not come either actually or constructively, to the possession of the consignee, and the vendors having demanded the goods within reasonable time, and while yet in possession of the officer, may recover their value. *Crawshay* v. *Eades*, 1 B. & C. 181, (8 E. C. L. 51;) *Edwards* v. *Brewer*, 2 M. & W. 374 ; *Sawyer* v. *Joslin*, 20 Vt. 172.

The opinion of the court was delivered by

POLAND, J.   The defendants now abandon all their exceptions taken upon the trial below, except to that part of the charge of the court, relative to the plaintiffs' right to stop the goods sued for, *in transitu*, on account of the insolvency of Wells, the purchaser of the goods from them, on credit. It appears to have been conceded that this was a case where every requisite existed to sustain this right in the plaintiffs to thus stop the goods before their *transit* ended. The only question litigated was, whether the *transit* was ended ; that is, whether the goods had actually come into the *actual* or *constructive* possession of Wells, the *vendee* and *consignee*.

There is perhaps no single question upon which more nice and subtle reasoning has been bestowed, or where more mere hairbreadth distinctions have been drawn, than upon the point where this right to stop ceases.

The general principle is conceded in all the cases to be that the right of stoppage exists while the goods are on their passage or journey, and until they have reached their destination, and come to the actual or constructive possession of the vendee.   In the present case however, the controversy seems mainly to have been as to the character in which the defendants acted when they took the goods from the cars at West Randolph, which was Wells' residence, and place of business, and the destination of the goods.   It seems

not to have been controverted that the defendants, hearing that the goods were coming upon the cars, went down as far as Windsor, where they found the goods in the cars, and that they went on board the cars with the goods, and one of the defendants was locked in the car containing the goods; that they came with them to West Randolph, where the cars arrived in the night, and that the goods were not taken to or deposited in the freight house of the railroad company at all, but that the defendants procured teams and took the goods directly from the cars, and took them away. It was conceded, too, that the defendant Spear, had, before this obtained a writ against Wells, and that the defendant Hutchinson was authorized to serve it, and that they had the writ with them at this time. The plaintiffs claimed, and their evidence tended to prove, that the defendants, in all their proceedings, in taking the goods and subsequently disposing of them, were acting under this attachment as creditor and officer, and that they held the goods under this claim when they were demanded by the plaintiffs' agent, and that they subsequently sold them at public auction upon the same writ. The plaintiffs claimed that the writ was served and the goods attached on board the cars at Windsor, but that the defendants could not, or did not, choose to remove the goods from the cars till their arrival at West Randolph.

The defendants claimed, and their evidence tended to prove, that they never attached the goods at all, at any time, that the writ and pretence of attachment were all an artifice to prevent the goods from being taken by other creditors of Wells, and officers who were watching for the purpose of making attachments, but that in fact, they went to Windsor as the private agents of Wells, under an arrangement with him, that they were to receive the goods for him, and that when the goods should thus be obtained, he would sell them to Spear, and that he did sell them to him the next morning after their arrival, and that Spear subsequently sold the goods, under his title thus obtained.

The plaintiffs conceded, and so the court charged, that if the jury found that the defendants were right in their claim, that they took the goods as the agents of Wells, then they had so come to his possession, that the plaintiffs' right to stop them as being *in transitu* was gone.

So the defendants conceded that if the plaintiffs established that the defendants really attached the goods, while on their route, at Windsor, and continued to hold them under the attachment until the plaintiffs demanded them, then the plaintiffs would be entitled to recover, because then the plaintiffs' right to stop undoubtedly existed when the defendant attached the goods, and if they attached wrongfully, and before the creditor's right to stop was gone, their right would not be lost by the subsequent removal by them of the goods, even to the place of their original destination. But the defendants claimed that if they ever attached the goods, it was not until the goods arrived at the depot at Randolph; that they knew and were told, they could not attach them on the cars, and that on their arrival there the *transit* was ended, and they could then lawfully attach them; and the court charged the jury that if the defendants attached the goods on their delivery from the cars to them at Randolph, and held them under that attachment, until demanded by the plaintiffs, then the plaintiffs' right to stop was not lost, and the plaintiffs could recover. The defendants claim that this part of the charge was erroneous, and that the plaintiffs' right to stop the goods had ceased on the arrival of the cars and goods at Randolph, their *ultimate destination* by the carrier. The defendants ground their objection mainly upon the decisions which have been made in reference to the different character and relation in which railroad companies and other carriers hold goods after their arrival and deposit, even in their own depots, or warehouses, from that in which they hold the goods while they are actually under transportation. It has been generally held in such cases that the principle of strict liability, which applies to common carriers, no longer exists after such deposit or storing of the goods, but that their liability is only that of ordinary wharfingers or warehousemen, to whom the principle of common diligence only applies.

It is said in many of the cases, that this right of stoppage *in transitu* only continues while the goods remain in the hands of the *carrier as such,* and that when the goods arrive at their destination and are stored or housed, so that they are held by a *wharfinger* or *warehouseman* merely to hold or keep till the vendee takes away the goods, the right to stop is gone. In the case of *Sawyer* v. *Joslin* 20 Vt. 172, goods were forwarded by a boat from Troy, N. Y.,

to Vergennes, consigned to Chapman, the vendee, who resided there and had failed. The goods were landed from the boat upon a wharf, but were not housed, or placed in custody of any one, and there was no claim upon them for freight, by the carriers, for which they could be detained. Chapman was in the habit of receiving his goods himself at this wharf, and it was expected he would so receive these. While the goods were thus lying on the wharf, the defendant, an officer, attached them on a writ against Chapman. The plaintiff claimed his right to stop them still existed, and he demanded and sued for them. It was held the plaintiff's right to stop them was gone. In the opinion of the court, which was delivered by HALL, J., a good deal of stress is laid upon the facts, that the goods when landed on the wharf, were not placed in the charge or custody of any person, but that the possession of them being thus vacant, was by law, in the general owner of the goods.

The fact too, that no claim existed on the goods, for the freight, but that Chapman was at full liberty to take possession of the goods, and they were subject to no lien, is also stated as an important element in determining whether the plaintiffs' right to stop the goods existed or was gone. It is not said in that case that if the goods had been stored in a warehouse upon the wharf, in the care of a wharfinger or warehouseman, with instructions not to deliver them to the vendee until he paid freight upon them, and the goods could not be taken by the vendee till he paid the freight and wharfage, the right of the vendor to stop them would have been held to exist, but from the case and the reasoning of the judge it is strongly implied.

We should not be now prepared to say that the right of the vendor to stop the goods existed, even if all those elements existed in a case, but we do not find any occasion to determine that question, for in this case the goods were never delivered into or stored in the freight house at all. The defendants, immediately on the arrival of the goods, took them from the cars to their teams, and they were never stored at all. The railroad company never became wharfingers or warehousemen of the goods. They held the goods *as carriers* when they were taken from the cars by the defendants.

In our opinion, the transit of these goods was not so complete and ended, but that the plaintiffs' right to stop them still existed,

when they were taken from the cars by the defendants. The defendants claim that the court erred in not charging the jury that if the defendants went to Windsor and got the goods to West Randolph with the knowledge and assent of Wells, and then attached them, they could hold them, because they had thus come to Wells' possession, by being in their possession as his agents.

In considering these instructions, as in all cases, it is important to ascertain what was the condition of the case and the respective theories of the parties upon the evidence upon which they claimed to recover. Now in the present case, the plaintiffs' theory was, that the defendants, in all they did, in taking and disposing of these goods, from first to last, acted as an attaching creditor and officer, and that all their proceedings were under their process, and the plaintiffs' evidence tended to prove all this.

The defendants' theory was, that there was never any attachment of these goods whatever; that in all the defendants did from their first going to Windsor, to the final sale of the goods, they acted wholly under an agreement and arrangement with Wells, and under no attachment, and that the writ they had was a mere feint to keep off other attachments, and the defendants' testimony tended to prove all this. Now the defendants say, the court ought to have charged the jury what the result would be, supposing they should find that the defendants were right in their theory, as to the object and design and authority of the defendants in going to Windsor and getting the goods to Randolph, and then should find that their theory after that was false, and that then they attached the goods and disposed of them under their attachment, as the plaintiffs claimed. It does not appear that the attention of the court was at all called to any such division of the defence, or of the plaintiff's claim, or that any request was made for any charge under such a finding, and without some special demand upon the judge, we think he was not bound to give any instructions, based upon any such supposition. In the absence of any special request for such instructions, it was enough for the judge to tell the jury what would be the law if they found the case made out as the plaintiffs claimed, and what would be the legal effect of finding it proved, as the defendants' evidence tended to show it. And especially in a case where there was no special reason to suppose that

one part of the defence was true, while another part was false, (as there does not appear to have been here,) a judge should not be required to set up any such special hypothesis of the case ?

We are satisfied that upon this part of the case, it was correctly and fairly put to the jury, and as all the other exceptions are abandoned, the judgment of the county court is affirmed.